**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

MARC ALAN REICHBART and
MICHAEL B. GARTNER, individually,
and on behalf of all others similarly situated,

CASE NO. _____

CLASS ACTION

      Plaintiffs,

v.

HEAR.COM LLC,

      Defendant.

_____/

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Marc Alan Reichbart ("Reichbart") and Michael B. Gartner ("Gartner") (together, "Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this Class Action Complaint against Defendant Hear.com LLC ("Hear.com" or "Defendant"), and allege as follows:

**NATURE OF THE ACTION**

1.     This is a class action lawsuit arising from Hear.com's collection and disclosure of website visitors' sensitive personal health and financial information and electronic communications to Google LLC ("Google"), TikTok, Inc. and ByteDance Ltd. (together, "TikTok"), Microsoft Corporation ("Microsoft"), and X Corp. ("Twitter/X") (collectively, the "Third-Party Recipients"), without prior notice and consent, through tracking mechanisms embedded in Defendant's website, www.hear.com (the "Website").

2.     Hear.com is one of the largest direct-to-consumer hearing care platforms in the United States and claims to operate the largest network of hearing care professionals in the world.

1

Through its Website, Hear.com connects individuals experiencing hearing loss with licensed hearing care professionals, provides hearing aid consultations and fittings, conducts online hearing assessments, and offers risk-free hearing aid trial programs.

3. The centerpiece of Hear.com's Website is a detailed online hearing assessment questionnaire (the "Questionnaire") that the Website promotes across virtually every page and that users are induced to complete as the first step in engaging with Hear.com's hearing care services. The Questionnaire systematically extracts extraordinarily sensitive personal, medical, and financial information from users, including: whether they currently use hearing aids and for how long; how many hours per day they rely on hearing aids; whether they suffer from tinnitus; how urgently they need hearing care services; their credit score; the identity of their health insurance carrier; the type of health insurance they carry; their employment and retirement status; and their status as a United States military veteran. These disclosures lay bare not only users' medical conditions, but their financial circumstances and backgrounds as well.

4. Unbeknownst to Website visitors, Hear.com has knowingly implemented six tracking tools operated by four third-party recipient groups: the Google Analytics Tracker and DoubleClick Tracker (both operated by Google), the TikTok Pixel (operated by TikTok/ByteDance), Microsoft Clarity and Bing Universal Event Tracking (operated by Microsoft), and the Twitter/X Pixel (operated by X Corp.) (collectively, the "Trackers" and each individually, a "Tracker"). When Website visitors complete the Questionnaire, take the online hearing test ("Hearing Test"), browse hearing-loss information, or otherwise interact with health-related content, Hear.com procures these Third-Party Recipients to intercept those electronic communications without consent. Critically, the strongest and most sensitive transmissions occur when Hear.com transmits users' specific Questionnaire responses—including answers about

2

hearing loss, tinnitus, hearing-aid use, health insurance, financial circumstances, employment status, and veteran status—in real time to one or more Third-Party Recipients, along with unique identifying cookies that link those responses to the individual user.

5. What makes Hear.com's conduct particularly egregious is the timing and sequence of these disclosures. Users are never asked to agree to any terms and conditions before they complete the Questionnaire. Instead, the Website funnels users through the entire Questionnaire—collecting their most sensitive personal, medical, and financial information at every step—and transmits that information to third-party advertisers in real time. Only at the very end of this process, *after* all the sensitive information has already been collected and shared, are users perfunctorily shown a reference to Hear.com's Terms and Conditions and Privacy Policy. By that point, the damage is done: Hear.com has already shared users' most private information with Google, TikTok, Microsoft, and Twitter/X.

6. This interception of private electronic communications occurs without appropriate notice to visitors and without obtaining their consent, in violation of (1) the Florida Security of Communications Act, Florida Statutes § 934.01, *et seq.* ("FSCA") and (2) the federal Electronic Communications Privacy Act, 18 U.S.C. § 2511 *et seq.* ("ECPA").

7. Under the FSCA, it is unlawful to intentionally intercept, endeavor to intercept, or procure any other person to intercept any wire, oral, or electronic communication without the consent of all parties to the communication. Hear.com violated the FSCA by deliberately embedding tracking technologies on its Website that procured Google, TikTok, Microsoft, and Twitter/X to intercept users' private electronic communications—including their specific responses to a detailed medical and financial questionnaire—in real time, without the knowledge or consent of any party to those communications.

8. Under the ECPA, similar protections exist at the federal level. Although the ECPA contains a one-party consent exception, that exception does not apply here because Hear.com procured the interceptions for the purpose of committing a criminal or tortious act—specifically, the unauthorized use and disclosure of individually identifiable health information for commercial advantage in violation of the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d-6.

9. Further, by systematically harvesting users' most sensitive medical, financial, and personal disclosures and monetizing that data for advertising and analytics purposes—without users' knowledge, consent, or compensation—Hear.com has also been unjustly enriched at Plaintiffs' and Class Members' expense.

10. Through this action, Plaintiffs seek to hold Hear.com accountable for these privacy violations, to obtain appropriate remedies for affected individuals, and to prevent the continued procurement of interception of electronic communications through Defendant's Website.

**PARTIES**

11. Plaintiff Marc Alan Reichbart is an adult citizen and Florida resident residing in Atlantis, Florida.

12. Plaintiff Michael B. Gartner is an adult citizen and Florida resident residing in Boca Raton, Florida.

13. Defendant Hear.com LLC ("Hear.com") is a limited liability company organized and existing under the laws of the State of Delaware. Hear.com is the U.S. arm of the international *audibene* group and operates as one of the largest direct-to-consumer hearing care platforms in the United States. Hear.com's principal place of business is in Coral Gables, Florida. Hear.com employs approximately 1,000 people in the United States, reports annual revenue of approximately

$265.5 million, and specializes in comprehensive hearing care solutions, including diagnostic evaluations, customized hearing aid fittings, online hearing assessments, remote support, and risk-free trial programs. Hear.com maintains and operates the Website.

## JURISDICTION AND VENUE

14. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges questions of federal law under the ECPA (18 U.S.C. § 2511, *et seq.*).

15. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because Plaintiffs' state-law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

16. This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

17. This Court has personal jurisdiction over Defendant because Hear.com is a Florida-based company with its principal place of business in Coral Gables, Florida, within the Southern District of Florida, and operates its Website from Florida. The acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

18. Venue is proper in the Miami Division of the Southern District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Hear.com's principal place of business is in Coral Gables, Florida, which is located within the Miami Division. The Website is accessible to and used by consumers throughout the Southern District, and the tracking conduct at issue is deployed from Hear.com's centralized Website operated from this District. Both Plaintiffs reside within the Southern District

of Florida. Hear.com's tracking conduct is nationwide in scope and emanates from its centralized Website, which is operated and maintained from Coral Gables, Florida.

<strong>FACTUAL ALLEGATIONS</strong>

**A. Overview of Website Tracking on Healthcare Websites**

19.     Many websites employ tracking technologies that collect personal data about users' online activities. These tracking technologies have become ubiquitous across the internet, collecting vast amounts of data about user behavior, preferences, and interests. In the healthcare context, these technologies are particularly concerning because they can capture sensitive medical information, including the types of treatments a user is researching, the medical professionals they are seeking, and the health conditions they may be experiencing.

20.     The interception of healthcare-related communications through these tracking technologies is particularly problematic, as it can reveal highly personal and sensitive medical conditions, treatment interests, financial circumstances, insurance status, and care-seeking behaviors to third parties without patients' knowledge or explicit consent.

21.     As detailed in this Complaint, Hear.com has implemented multiple tracking technologies on its Website, resulting in the unauthorized interception of visitors' electronic communications by Google, TikTok, Microsoft, and Twitter/X.

**B. The Google Analytics and DoubleClick Tracking Technologies**

22.     Google is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms, generating over $200 billion in annual revenue primarily through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its numerous products and services, which it then leverages to deliver targeted advertisements.

23. The Google Analytics 4 Tracker ("Google Analytics Tracker") is a web analytics service offered by Google that allows website owners to track visitors' actions on their website to gain insights into users' behavior and to target them with personalized advertisements. Hear.com has implemented the Google Analytics Tracker on its Website.

24. The Google Analytics Tracker is a JavaScript-based tracking technology. Website owners implement the Tracker by adding a snippet of JavaScript code to their website's source code. Once implemented, the Tracker loads automatically and immediately whenever a user visits a page containing the Tracker's source code. The tracking code executes in the background without any visible indication to the user, making it completely invisible to ordinary website visitors.

25. The Google Analytics Tracker intercepts and collects various data points about user interactions with a website and transmits details of these interactions to Google. Along with these events, the Tracker transmits unique identifying cookies, including the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies. The 3PSID, 3PAPISID, and 3PSIDCC cookies allow Google to identify users who are signed into their Google accounts (e.g., via Gmail or Chrome), thereby linking browsing activity on third-party websites to an authenticated Google identity. The NID cookie, by contrast, collects information from users even when they are not signed into a Google account, including users who have never authenticated their account or are logged out, enabling tracking regardless of authentication or login status. These cookies enable Google to create comprehensive user profiles and are third-party marketing cookies, meaning the information does not stay within the site but is sent to Google itself. These cookies constitute personally identifiable information ("PII") as they are unique to each user and may be used to identify individuals.

26.     DoubleClick is an advertising tracking tool owned by Google and designed to collect information about user behavior on websites to improve the targeting and effectiveness of advertising campaigns. Hear.com has implemented the DoubleClick Tracker on its Website.

27.     Through the DoubleClick Tracker, Google creates and assigns unique identifiers to website visitors, including through the IDE and DSID cookies. The IDE cookie is a persistent advertising identifier used to build user profiles for cross-site ad targeting and to measure advertising effectiveness by tracking actions users take after viewing or clicking on advertisements. The DSID cookie is an account-linked identifier that is set when a user is logged into a Google account; it links browsing activity on non-Google websites to the user's Google account and ensures that the user's ad personalization settings are applied across non-Google sites. These cookies, along with the user's IP address, constitute PII as they are unique to each user and may be used to identify individuals.

## C.  The TikTok Pixel

28.     TikTok operates a global social media and digital advertising platform. Hear.com has implemented the TikTok Pixel on its Website.

29.     The TikTok Pixel is a piece of JavaScript code that website owners embed into their website's source code, enabling them to share website events with TikTok. Once installed, the TikTok Pixel creates cookies on visitors' web browsers and transmits data to TikTok about user activity. The TikTok Pixel collects and reports to TikTok: (a) ad and event information reflecting specific actions a user has initiated on the website; (b) the timestamp of each action; (c) the user's IP address, used to determine geographic location; (d) device details including make, model, and operating system; (e) browser information; (f) cookies; and (g) metadata and button clicks, including descriptive page metadata, structured microdata, and page performance data.

30.     The TikTok Pixel creates and transmits the "_ttp" cookie, which is a tracking cookie used by TikTok to identify a visitor, whether or not the user has a TikTok account. The _ttp cookie is a persistent, unique browser-level identifier that enables TikTok to associate that user's activity with a TikTok advertising profile and deliver targeted advertisements. For users who are logged into their TikTok accounts, the HTTP request sent to TikTok contains additional cookies that link the data shared to the user's TikTok profile, enabling even more precise identification and targeting.

31.     TikTok also offers an "AutoAdvanced Matching" feature that, when enabled, automatically collects form data—including email addresses and phone numbers entered by users—and transmits this data to TikTok to enhance the accuracy of user matching to their TikTok profiles, thereby improving ad targeting. This feature is enabled on Hear.com's Website. As a result, when users enter their contact information at the end of the Questionnaire to receive their results, Hear.com transmits that information to TikTok as well.

**D.  The Microsoft Advertising Ecosystem (Clarity and Bing Universal Event Tracking)**

32.     Microsoft Corporation ("Microsoft") collects user data through its Clarity analytics tool and Bing Universal Event Tracking ("UET") advertising service. Hear.com has implemented both Microsoft Clarity and Bing UET on its Website.

33.     Microsoft Clarity is a behavioral analytics tool that tracks user interactions on websites, including which pages users view, where they click, and how they scroll. Bing UET is connected to Microsoft's search and advertising network and enables Microsoft to build targeted advertising profiles based on users' website interactions.

34.     When a user visits a website that uses Microsoft Clarity or Bing UET, information about their actions on the site is automatically sent to Microsoft along with the MUID Microsoft User ID ("MUID") cookie. The MUID cookie serves as a persistent browser-level identifier that

9

Microsoft uses to recognize the same user across different and unrelated websites that also use Microsoft tracking technologies, enabling Microsoft to consolidate activity into unified behavioral profiles. Both Clarity and Bing UET rely on the MUID cookie as a core identifier. The MUID cookie contains a unique browser identifier or, when applicable, an ID associated with the user's Microsoft account, and constitutes PII as it is unique to each user and may be used to identify individuals.

35.     Microsoft's Privacy Policy confirms that it uses the data collected to "advertise and market to you, which includes sending promotional communications, targeting advertising, and presenting you with relevant offers." Microsoft further expressly states: "In carrying out these purposes, we combine data we collect from different contexts (for example, from your use of two Microsoft products) or obtain from third parties to give you a more seamless, consistent, and personalized experience."

**E.  The Twitter/X Pixel**

36.     Twitter/X, operated by X Corp., is a digital social media and advertising platform that provides content distribution and targeted advertising services, including cross-platform ad delivery, audience targeting, and ad measurement across its own services and third-party websites. Hear.com has implemented the Twitter/X Pixel on its Website.

37.     The Twitter/X Pixel collects user data such as identifiers, IP address, browsing activity, page visits, referrer URLs, device and browser characteristics, ad engagement data, and inferred interests or preferences based on interactions on and off the Twitter/X platform.

38.     The Twitter/X cookies, including "personalization_id", "guest_id", and "muc_ads", are persistent and unique browser cookies that store a unique user or device identifier and session metadata, enabling Twitter/X to recognize users across different websites and sessions, deliver personalized ads and content, and retarget users after they leave a site. Twitter/X notes that

it "stores information about other websites where you've seen X content or accessed our services." These cookies constitute PII as they are unique to each user and may be used to identify individuals.

39. In certain implementations, tracking and remarketing requests related to Twitter/X are routed through the "t.co" URL wrapper, which allows Twitter/X to track users' engagement and interactions across websites.

**F. Hear.com Shares Users' Private Health and Financial Information with Third Parties**

40. Through the Website, users can perform a range of activities, including completing an online hearing assessment Questionnaire, taking an Hearing Test, browsing hearing loss symptoms and conditions, researching hearing aid options, and requesting consultations with hearing specialists. Users communicate their private and personal information via the site, including protected health information ("PHI"). Unbeknownst to the Website's users, Hear.com is surreptitiously sharing private and protected information with Google, TikTok, Microsoft, and Twitter/X without users' consent.

41. It is important to note that the Website is structured as a funnel aimed at encouraging users to complete the Questionnaire and the Hearing Test or request a free consultation with a hearing specialist. Accordingly, most users interacting with the Website are individuals actively seeking hearing care services and providing health-related and other sensitive personal information in the process. To the extent these individuals establish a provider-patient relationship with Hear.com or one of its partner audiologists, the data transmitted through these interactions constitutes patient data or, at minimum, highly sensitive health-related information.

42. When a user visits the Website, their browser sends an HTTP request to the Website's server to load the page. In response, the server sends back the webpage, which contains

11

a small piece of code known as a tracker or pixel. The tracker or pixel instructs the browser to send the user's IP address, along with other identifying data like cookies, browser details, and device information, to a third-party tracking service. This allows the tracker or pixel to monitor user activity and gather insights about the users' behavior on the site. The sections below describe users' interactions with the Website and how they are shared with the Third-Party Recipients in real time.

### G. User Answers on the Online Hearing Assessment Questionnaire

43.     Across the Website, users are consistently prompted, through numerous buttons and pages, to complete the Questionnaire as the first step in interacting with Hear.com's service. The Questionnaire is accessible from the homepage, the hearing-aids subpages, the hearing-loss subpages, the symptoms subpages, and numerous other pages throughout the Website. The Website markets the Questionnaire as an assessment for a "free hearing aid trial"—offering users the prospect of receiving free hearing aid devices in exchange for completing the Questionnaire.

44.     The Questionnaire is structured as a multi-step, interactive series of questions that systematically collects extraordinarily sensitive personal, medical, and financial information. Over the course of completing the Questionnaire, users are asked to disclose, among other things:

(a) How they obtained their current hearing aids (or that they do not currently use them);

(b) The age of their current hearing aids (e.g., five or more years old);

(c) How many hours per day they rely on their hearing aids (e.g., at least six hours per day);

(d) Whether they suffer from tinnitus (ringing or buzzing in the ears);

(e) How urgently they need to purchase hearing aids (e.g., as soon as possible);

(f) Their credit score range (e.g., "Poor," below 580);

12

(g) Their health insurance type (e.g., Medicare Advantage);

(h) The specific name of their health insurance carrier (e.g., Humana);

(i) Their professional and employment status (e.g., retired); and

(j) Whether they are a United States military veteran.

45.     This is not routine medical intake information. The combination of a user's hearing loss condition and severity, daily reliance on hearing aids, tinnitus diagnosis, credit score, specific insurance carrier, employment and retirement status, and veteran status constitutes a comprehensive portrait of that individual's medical condition, financial circumstances, and personal background. These are precisely the categories of information that individuals have the strongest privacy interest in protecting and the most reasonable expectation that they will not be disclosed to advertising companies.

46.     What makes Hear.com's conduct especially alarming is that the Website transmits users' Questionnaire answers and related health-care interactions in real time to third-party advertising platforms, together with persistent identifiers that tie those communications to the individual user. As documented in the technical records of these interactions, when a user clicks an answer button in the Questionnaire, the Website fires data-transmission requests to third-party advertising platforms, including requests that transmit the user's specific answer and/or the user's progress through the Questionnaire along with the platform's unique identifying cookie: the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies to Google Analytics; the IDE and DSID cookies to DoubleClick; the _ttp cookie to TikTok; the MUID cookie to Microsoft; and the personalization_id and guest_id cookies to Twitter/X. These transmissions occur automatically and invisibly, with no indication to the user that their personal, medical, and financial disclosures

are being transmitted to advertising companies. The sections below document the specific interception occurring through the Trackers.

### i.      Interception by TikTok

47.      As documented in the screenshots below, each individual answer a user provides in the Questionnaire triggers an immediate POST request[1] to analytics.tiktok.com, transmitting the user's specific answer along with their unique _ttp cookie. This means TikTok receives not just the fact that a user visited Hear.com, but the precise content of each individual answer—every medical disclosure, every financial detail, every personal circumstance—individually labeled and linked to the user's persistent advertising identifier.

48.      The image below illustrates how the user's answer "I don't remember" about how they obtained their hearing aids is transmitted to TikTok with the _ttp cookie (event ID: "How_did_you_get_your_hearing_aids_c_Do_not_remember"):



*Questionnaire answer about hearing aid history transmitted in real time to TikTok with _ttp cookie.*

---

[1] A "POST request" is an HTTP method used to send data to a server and is often used when a user uploads a document or completes a form or questionnaire on a website. *See* W3 Schools, *HTTP Request Methods*, https://www.w3schools.com/Tags/ref_httpmethods.asp (last accessed May 13, 2026).

49.     The image below illustrates how the user's answer "5 years old or more" about the age of their current hearing aids is transmitted to TikTok (event ID: "Age_of_current_hearing_aid_c_5"):



*Questionnaire answer about hearing aid age transmitted in real time to TikTok with _ttp cookie.*

50.     The image below illustrates how the user's answer "At least 6 hours a day" about daily hearing aid usage is transmitted to TikTok (event ID: "Hearing_aid_usage_c_At_least_6_hours_a_day"):



*Questionnaire answer about daily hearing aid reliance transmitted in real time to TikTok with _ttp cookie.*

51. The image below illustrates how the user's answer "Yes" confirming they suffer from tinnitus is transmitted to TikTok, disclosing a specific medical condition (event ID: "Tinnitus_c_Yes"):



*User's tinnitus diagnosis transmitted in real time to TikTok with _ttp cookie.*

52. The image below illustrates how the user's answer "As soon as possible" regarding purchase urgency is transmitted to TikTok (event ID: "Purchase_timeframe_c_asap"):

*User's urgency of need for hearing aids transmitted in real time to TikTok with _ttp cookie.*

53.     The image below illustrates how the user's answer indicating a poor credit score below 580 is transmitted to TikTok, disclosing the user's financial circumstances (event ID: "credit_score_c_Poor_580_639_"):



*User's credit score (poor, below 580) transmitted in real time to TikTok with _ttp cookie.*

54.     The image below illustrates how the user's answer "Medicare Advantage" identifying their insurance type is transmitted to TikTok (event ID: "Insurance_type_c_Medicare_Advantage"):



*User's health insurance type (Medicare Advantage) transmitted in real time to TikTok with _ttp cookie.*

55.  The image below illustrates how the user's answer "Humana" identifying their specific insurance carrier is transmitted to TikTok (event ID: "Insurance_Company_c_Humana"):



*User's specific insurance carrier (Humana) transmitted in real time to TikTok with _ttp cookie.*

56.  The image below illustrates how the user's answer "Retired" regarding their employment and professional status is transmitted to TikTok (event ID: "Professional_Status_c_Retired"):

*User's retirement/employment status transmitted in real time to TikTok with _ttp cookie.*

18

57. The image below illustrates how the user's answer "Yes" confirming their status as a United States military veteran is transmitted to TikTok (event ID: "veteran_c_Yes"):

*User's U.S. veteran status transmitted in real time to TikTok with _ttp cookie.*

### i.      Interception by Google Analytics

58. Google Analytics intercepts and transmits users' interactions with the Questionnaire pages to Google's servers in real time. Each time a user loads a Questionnaire page—including each step of the multi-page Questionnaire—the Google Analytics Tracker fires an event to Google containing the full URL of the page visited, which encodes the user's progress through the Questionnaire, together with the user's 3PSID, 3PAPISID, 3PSIDCC, and NID cookies. For users signed into a Google account, the 3PSID, 3PAPISID, and 3PSIDCC cookies directly link the Questionnaire interaction to the user's authenticated Google identity. For users not signed in, the NID cookie still enables Google to identify and track the user across the web. As shown in the marked-up image below, the user's pageview of the Questionnaire and Hearing Test flow is transmitted to Google Analytics along with the user's unique Google identifying cookies:

19



*User's interaction with the Questionnaire and Hearing Test flow transmitted to Google Analytics with the \_\_Secure-3PSID, \_\_Secure-3PAPISID, \_\_Secure-3PSIDCC, and NID identifying cookies.*

### ii.      Interception by DoubleClick

59.      Google's DoubleClick advertising platform separately intercepts users' Questionnaire and Website interactions, transmitting data to Google's advertising infrastructure via requests to googleads.g.doubleclick.net. These transmissions carry the user's IDE cookie—a persistent cross-site advertising identifier—along with the URL of the page the user is visiting on Hear.com, enabling Google to associate the user's health-related browsing with their advertising profile and serve them targeted ads. As shown in the marked-up image below, the user's interaction with the Questionnaire and Hearing Test flow is transmitted to DoubleClick along with the user's IDE cookie:



*User's interaction with the Questionnaire and Hearing Test flow transmitted to DoubleClick/Google with the IDE persistent advertising cookie.*

60.     In addition, as shown below, when users browse hearing loss information on the Website, those page visits are also transmitted to DoubleClick with the IDE cookie, enabling Google to build a comprehensive profile of the user's hearing-related health research:



*User's visit to the Hearing Loss Symptoms page transmitted to DoubleClick/Google with the IDE cookie.*

### iii.     Interception by Microsoft Clarity and Bing Universal Event Tracking

61.     Microsoft's Clarity analytics tool and Bing UET advertising service intercept users' Website interactions and transmit them to Microsoft via POST requests to f.clarity.ms. These transmissions carry the user's MUID cookie—a persistent, unique browser-level identifier that

Microsoft uses to recognize and track users across different websites and build unified behavioral advertising profiles. Each page a user visits on Hear.com, including each step of the Questionnaire, the Hearing Test, and hearing loss information pages, is reported to Microsoft in real time along with the MUID cookie. As shown in the images below, Microsoft intercepts users' visits to health-related pages on the Website with the MUID identifying cookie:



*User's visit to the Hearing Loss Symptoms page transmitted to Microsoft Clarity with the MUID identifying cookie.*

62.     Microsoft Clarity similarly intercepts and transmits users' visits to specific medical condition pages, as shown below when a user navigates to the Sensorineural Hearing Loss page:



*User's visit to the Sensorineural Hearing Loss page transmitted to Microsoft Clarity with the MUID identifying cookie.*

### iv.   Interception by Twitter/X

63.   The Twitter/X Pixel intercepts users' Questionnaire and Website interactions and transmits them to Twitter/X's servers via requests to analytics.twitter.com. These transmissions carry the user's personalization_id, guest_id_marketing, guest_id_ads, and guest_id cookies— persistent, unique browser identifiers that Twitter/X uses to recognize users across different websites and browsing sessions, associate their browsing activity with their Twitter/X advertising profiles, and deliver retargeted advertisements. Twitter/X thereby learns not only that the user visited Hear.com, but the specific pages they viewed and the health-related activities they engaged in on the Website. As shown in the marked-up image below, the user's interaction with the Questionnaire and Hearing Test flow is transmitted to Twitter/X along with the user's personalization_id and guest_id cookies:



*User's interaction with the Questionnaire and Hearing Test flow transmitted to Twitter/X with the personalization_id, guest_id_marketing, and guest_id_ads identifying cookies.*

64.   Critically, none of this information-sharing occurs with users' knowledge or consent. A user completing the Questionnaire has no reason to believe their private medical, financial, and personal disclosures are being simultaneously transmitted to Google, TikTok, Microsoft, and Twitter/X in real time. The tracking code executes in the background, entirely

invisible to ordinary website visitors. Only users with technical knowledge who deliberately inspect the page's source code or use specialized browser tools might detect the presence of these tracking mechanisms.

65.     Troublingly, users are not presented with Hear.com's Terms and Conditions or Privacy Policy at any point during the Questionnaire itself. The Website guides users through the entire Questionnaire—collecting their hearing loss history, tinnitus diagnosis, credit score, insurance carrier, employment status, veteran status, and other sensitive information—without ever asking them to agree to, acknowledge, or even view any terms and conditions. Only at the very final stage of the Questionnaire, after all of a user's sensitive information has been collected and transmitted to third-party advertisers, does the Website display a small-print reference to Hear.com's Privacy Policy, HIPAA Notice of Privacy Practices, and Terms and Conditions. By that point, the unauthorized interception has already occurred.

**H.  User Completion of the Online Hearing Test**

66.     In addition to the Questionnaire, the Website offers an online Hearing Test. As shown below, the Hearing Test is accessible from the Website's navigation menus under the "Resources" tab:



*User clicks on the Hearing Test from the Website's Resources menu.*

67.      When a user clicks on the Hearing Test link, they are directed to the Online Hearing

Screening landing page, as shown below:



*The Online Hearing Screening landing page. No terms and conditions are presented to the user at this stage.*

68.     Just as with the Questionnaire, users' engagement with the Hearing Test is intercepted and transmitted in real time to Third-Party Recipients along with unique identifying cookies that tie the interaction to the individual user. Upon completion of the Hearing Test, the Website presents users with a results page prompting them to enter their name and email address to receive their results, as shown below. It is only at this point—after the Questionnaire and Hearing Test activity has already been completed and transmitted to advertising platforms—that any reference to Hear.com's Privacy Policy, HIPAA Notice of Privacy Practices, and Terms and Conditions appears, in small print below the "Get Your Results" button:



*The Hearing Test results page. A reference to Terms and Conditions and Privacy Policy appears only here—after all data has already been collected and transmitted.*

69.     The sections below document the specific interception of users' Hearing Test activity occurring through each of the Trackers.

26

### i.      Interception by TikTok

70.      When a user clicks "Get Your Results" at the conclusion of the Hearing Test, the Website fires an immediate POST request to analytics.tiktok.com, transmitting the user's interaction—including the fact that they have completed a hearing screening—along with their unique _ttp cookie. This transmission confirms to TikTok that the user has undergone a hearing test, linking that medically sensitive fact to the user's persistent TikTok advertising identifier. As shown in the marked-up image below:



*User's completion of the Hearing Test ("Get Your Results" click) transmitted to TikTok in real time with the _ttp identifying cookie.*

### ii.      Interception by Google Analytics

71.      When a user initiates and engages with the Hearing Test, the Google Analytics Tracker fires a request to analytics.google.com, transmitting the user's pageview of the Hearing Test flow along with their unique Google identifying cookies—including the __Secure-3PSID, __Secure-3PAPISID, __Secure-3PSIDCC, and NID cookies. For users signed into a Google account, these cookies directly link the Hearing Test interaction to the user's authenticated Google identity. For users not signed in, the NID cookie still enables Google to identify and track the user. The full URL transmitted to Google encodes the Hearing Test page, enabling Google to know that the user was engaged with a hearing screening. As shown in the marked-up image below:



*User's engagement with the Hearing Test transmitted to Google Analytics with the __Secure-3PSID, __Secure-3PAPISID, __Secure-3PSIDCC, and NID identifying cookies.*

### iii.   Interception by DoubleClick

72.   Google's DoubleClick advertising platform separately intercepts users' engagement with the Hearing Test, firing a request to googleads.g.doubleclick.net and transmitting the hearing test page URL along with the user's IDE cookie—a persistent cross-site advertising identifier. This enables Google to associate the user's completion of an online hearing screening with their advertising profile and serve them targeted advertisements accordingly. As shown in the marked-up image below:



*User's engagement with the Hearing Test transmitted to DoubleClick/Google with the IDE persistent advertising cookie.*

### iv.   Interception by Microsoft Clarity and Bing Universal Event Tracking

73.   Microsoft's Clarity analytics tool and Bing UET advertising service intercept users' engagement with the Hearing Test, firing POST requests to f.clarity.ms and transmitting the Hearing Test page URL along with the user's MUID cookie. The MUID cookie enables Microsoft to recognize the user across different websites and sessions and build a behavioral advertising profile that incorporates the user's Hearing Test activity. The same Clarity tracking mechanism that captures hearing-related browsing activity across Hear.com's Website—illustrated below in the context of users visiting hearing loss information pages—operates identically on the Hearing Test pages:



*Microsoft Clarity intercepting a user's visit to a hearing loss page with the MUID cookie—the same tracking mechanism that fires on the Hearing Test pages.*

### v.   Interception by Twitter/X

74.   The Twitter/X Pixel intercepts users' engagement with the Hearing Test, firing a POST request to analytics.twitter.com and transmitting the hearing test page URL along with the user's personalization_id, guest_id_marketing, guest_id_ads, and guest_id cookies. These persistent, unique browser identifiers enable Twitter/X to associate the user's completion of an online hearing screening with their Twitter/X advertising profile and retarget them with hearing-

related advertisements across the Twitter/X platform and partner networks. As shown in the marked-up image below:



*User's engagement with the Hearing Test transmitted to Twitter/X with the personalization_id, guest_id_marketing, and guest_id_ads identifying cookies.*

### I. User Browsing Activity Across All Pages of the Website

75. The interception of users' electronic communications is not limited to the Questionnaire and the Hearing Test. Every page a user visits on Hear.com's Website—including pages describing hearing loss symptoms, specific medical diagnoses, hearing aid options, and other health-related content—is intercepted and transmitted to the Third-Party Recipients in real time, along with their respective unique identifying cookies. Through these transmissions, Google, TikTok, Microsoft, and Twitter/X learn not only that the user visited Hear.com, but the specific medical topics and conditions the user was researching.

76. As shown below, when users navigate to the Website's Hearing Loss Symptoms page—revealing that they are investigating whether they may have hearing loss—that visit is transmitted to the Third-Party Recipients:

30



*The Hearing Loss Symptoms page on Hear.com. A user's visit to this page reveals they are investigating whether they have hearing loss.*

77.     When users navigate deeper into specific medical diagnoses—such as the Website's Sensorineural Hearing Loss page—those visits are likewise transmitted to the Third-Party Recipients, disclosing the specific medical condition the user is researching:



*The Sensorineural Hearing Loss page on Hear.com. A user's visit reveals research into a specific medical diagnosis.*

78.     The sections below document the specific interception of users' browsing activity occurring through each of the Trackers.

**i.      Interception by TikTok**

79.     When a user visits pages on Hear.com related to specific medical conditions—such as the Sensorineural Hearing Loss page—the TikTok Pixel fires an immediate POST request to analytics.tiktok.com, transmitting the user's visit to that page along with their unique _ttp cookie. This transmission reveals to TikTok the specific medical condition the user is researching and links that sensitive health information to the user's persistent TikTok advertising identifier. As shown in the marked-up image below:



*User's visit to the Sensorineural Hearing Loss page transmitted to TikTok in real time with the _ttp identifying cookie.*

### ii.  Interception by Google Analytics

80.     The Google Analytics Tracker intercepts users' visits to every page on Hear.com's Website, including all hearing loss symptom pages, medical condition pages, and hearing aid information pages, firing requests to analytics.google.com with the full URL of each page visited and the user's unique Google identifying cookies—including the __Secure-3PSID, __Secure-3PAPISID, __Secure-3PSIDCC, and NID cookies. Through these transmissions, Google receives a comprehensive record of every health-related topic the user researched on Hear.com, linked to the user's Google identity. The Google Analytics tracking mechanism that captures these browsing transmissions operates identically across every page of the Website, including all medical condition and hearing loss information pages—the same mechanism documented in Section H.2 above in connection with the Hearing Test.

### iii.  Interception by DoubleClick

81.     Google's DoubleClick advertising platform separately intercepts users' visits to hearing loss and medical condition pages on Hear.com, firing requests to googleads.g.doubleclick.net with the URL of each page visited and the user's IDE cookie. As shown in the marked-up image below, when a user visits the Hearing Loss Symptoms page, that

visit is transmitted to DoubleClick along with the user's persistent advertising identifier, enabling

Google to associate the user's hearing loss research with their cross-site advertising profile:



*User's visit to the Hearing Loss Symptoms page transmitted to DoubleClick/Google with the IDE persistent advertising cookie.*

### iv.      Interception by Microsoft Clarity and Bing Universal Event Tracking

82.      Microsoft's Clarity and Bing UET tools intercept users' visits to hearing loss and

medical condition pages on Hear.com, firing POST requests to f.clarity.ms with the URL of each

page visited and the user's MUID cookie. As shown in the marked-up images below, Microsoft

receives transmissions when users visit both the Hearing Loss Symptoms page and the

Sensorineural Hearing Loss page, linking those health-related page visits to the user's persistent

Microsoft advertising identifier:



*User's visit to the Hearing Loss Symptoms page transmitted to Microsoft Clarity with the MUID identifying cookie.*

83.     Microsoft Clarity similarly intercepts users' visits to specific medical condition pages, as shown below:



*User's visit to the Sensorineural Hearing Loss page transmitted to Microsoft Clarity with the MUID identifying cookie.*

### v.     Interception by Twitter/X

84.     The Twitter/X Pixel intercepts users' visits to every page on Hear.com's Website, including all hearing loss symptom pages and medical condition pages, firing POST requests to analytics.twitter.com with the URL of each page visited and the user's personalization_id, guest_id_marketing, guest_id_ads, and guest_id cookies. Through these transmissions, Twitter/X receives a record of the specific health-related topics the user researched on Hear.com and

associates that information with the user's persistent Twitter/X advertising identifier, enabling retargeted advertising across the Twitter/X platform and partner networks. The Twitter/X tracking mechanism that captures these browsing transmissions operates identically across every page of the Website—the same mechanism documented in Section H.5 above in connection with the Hearing Test.

85.     Every page URL visited by users on the Website is shared with one or more Third-Party Recipients. Through these URL transmissions, Google, TikTok, Microsoft, and Twitter/X learn not only that the user visited Hear.com generally, but also the specific hearing-related topics and conditions the user was researching—including hearing loss symptoms, sensorineural hearing loss, treatment options, hearing aid types, and related health information. The Complaint focuses on Google, TikTok, Microsoft, and Twitter/X because those are the tracking systems documented here; discovery may reveal additional recipients, including, but not limited to, Taboola.

**J.  Defendant's Responsibility for the Interception of Electronic Communications**

86.     Although the Trackers perform the technical functions of intercepting electronic communications, Hear.com bears full legal responsibility for these actions under the FSCA and ECPA as the entity that has procured Google, TikTok, Microsoft, and Twitter/X to intercept these communications.

87.     Hear.com knowingly made the affirmative decision to implement the Google Analytics Tracker, DoubleClick Tracker, TikTok Pixel, Microsoft Clarity, Bing UET, and Twitter/X Pixel on its Website. This implementation was deliberate and required Defendant, or persons acting on its behalf, to configure and deploy the Trackers on the Website. Without Hear.com's implementation and continued operation of this code, the Third-Party Recipients would not have received the electronic communications at issue.

88.     Defendant controls, or has the practical ability to control, which pages and events on its Website contain or trigger the tracking code. Hear.com could exclude tracking from sensitive pages and form events where health, insurance, and financial information is accessed or inputted, yet chose to deploy tracking on the Questionnaire and Hearing Test flows where the most sensitive information is collected.

**K.  Hear.com's Privacy Policy Does Not Authorize the Tracking Conduct**

89.     Hear.com's Website includes links to a Privacy Policy, HIPAA Notice of Privacy Practices, and Terms and Conditions in the footer of the Website's landing pages, as shown below:



*Hear.com's Privacy Policy, HIPAA Notice, and Terms and Conditions appear only as small-print footer links—never presented to users during the Questionnaire or Hearing Test.*

90.     As discussed above, users are not required to affirmatively agree to Hear.com's Privacy Policy, HIPAA Notice, or Terms and Conditions before completing the Questionnaire or the Hearing Test. These documents are accessible only as hyperlinks in small print in the Website's footer or on the final results page, which users do not reach until after they have already completed

37

the Questionnaire and submitted all their sensitive information. To the extent Hear.com relies on any such policy or agreement to assert that users consented to the tracking conduct described herein, any such policy is unenforceable under these circumstances. Browsewrap agreements are only enforced when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice before they engage with the website. *See Farsian v. Alphalete Athletics, LLC*, 2025 WL 1591452, at *4 (S.D. Fla. Feb. 25, 2025); *see also Tejon v. Zeus Networks, LLC*, 725 F. Supp. 3d 1351, 1355 (S.D. Fla. 2024). Hear.com's policy links fail this test. They are presented in small-print footers that users have no occasion to see before completing the Questionnaire, and there is nothing in the Questionnaire flow that would place a user on notice that merely completing the Questionnaire would constitute implied acceptance of the terms of any hyperlinked policy.

91.     Even if enforceable, Hear.com's privacy policy does not operate as consent to Hear.com's use of the Trackers to intercept users' private health, financial, and personal information and transmit it to third-party advertising companies. Consent is generally limited to the specific conduct authorized, and a reasonable person would not understand a generic privacy policy to authorize the interception and real-time transmission of their tinnitus diagnosis, credit score, insurance carrier identity, veteran status, and other sensitive disclosures to TikTok, Google, Microsoft, and Twitter/X for advertising purposes.

### L.  Hear.com's Conduct Violates HIPAA

92.     Hear.com is a hearing-care company that provides hearing-aid-related health care services, coordinates consultations with hearing-care professionals, collects insurance and payment information, and maintains information concerning consumers' hearing conditions, treatment needs, insurance coverage, and hearing-care devices. Hear.com publishes a HIPAA Notice of Privacy Practices stating that it uses and discloses protected health information for

treatment, payment, and health care operations, including to coordinate hearing-care treatment and determine insurance coverage. Those representations confirm, or at minimum plausibly support, that Hear.com is a covered entity under HIPAA or alternatively acts as a business associate of covered hearing-care providers when it creates, receives, maintains, or transmits PHI on their behalf, within the meaning of 45 C.F.R. § 160.103.

93.     PHI is defined as "individually identifiable health information" that is (i) transmitted by electronic media; (ii) maintained in electronic media; or (iii) transmitted or maintained in any other form or medium. 45 C.F.R. § 160.103. Individually identifiable health information ("IIHI") is defined in 45 C.F.R. § 160.103 as any health information that is: (1) created or received by a healthcare provider; (2) relates to an individual's past, present, or future physical or mental health or condition; and (3) either identifies the individual or provides a reasonable basis to believe the individual can be identified.

94.     When users visit the Website and complete the Questionnaire, they disclose information relating to their hearing loss conditions, tinnitus, hearing aid usage, and need for hearing care—all of which relate to their past, present, or future physical health or condition. This information, when combined with identifiers such as the Google Analytics, DoubleClick, TikTok, Microsoft, and Twitter/X tracking cookies, qualifies as PHI because it is (1) individually identifiable and (2) relates to the user's health status. The cookies and device identifiers transmitted alongside users' health-related interactions constitute "unique identifying number[s], characteristic[s], or code[s]" under 45 C.F.R. § 164.514(b)(2)(i), qualifying as indirect identifiers. When those identifiers travel in the same payload as the medical condition disclosures, the combined dataset becomes individually identifiable health information, and therefore PHI.

39

95.     The nature of the PHI intercepted from Hear.com's Website is particularly sensitive. The core health information includes users' hearing loss condition and severity, daily hearing-aid reliance, tinnitus status, hearing-test activity, insurance type and carrier, and urgency of need for medical devices. Hear.com also collects financial and personal background information, including credit score, employment or retirement status, and veteran status, which intensifies the privacy invasion and enables more granular profiling. The disclosure of this information to advertising companies exposes users not only to privacy violations, but to the risk of stigma, discrimination, and targeted exploitation.

96.     Under HIPAA, it is unlawful for a covered entity to knowingly disclose individually identifiable health information without authorization with intent to sell, transfer, or use such information for commercial advantage, personal gain, or malicious harm. 42 U.S.C. § 1320d-6. Hear.com did not deploy the Trackers merely for passive website maintenance. It deployed and used them for commercial purposes, including advertising analytics, conversion measurement, retargeting, audience building, and optimization of its sales funnel. Hear.com's deployment of the Trackers, which results in the automatic transmission of users' PHI to Google, TikTok, Microsoft, and Twitter/X for those commercial purposes, constitutes an unauthorized disclosure of PHI in violation of HIPAA.

97.     Upon information and belief, Hear.com has not executed HIPAA-compliant Business Associate Agreements ("BAAs") with Google, TikTok, Microsoft, or Twitter/X for the tracking activities described herein and has not obtained the HIPAA-compliant patient authorizations necessary to permit such disclosures for non-treatment purposes.

98.     Hear.com had actual and constructive knowledge that its deployment of third-party trackers on its Website violated HIPAA. In December 2022, the U.S. Department of Health and

40

Human Services Office for Civil Rights issued guidance expressly warning HIPAA-covered entities and business associates that the use of third-party tracking technologies on websites— including pixel tracking tools—that transmit protected health information to third-party vendors without a valid BAA constitutes an unauthorized disclosure in violation of HIPAA. Hear.com, which publishes its own HIPAA Notice of Privacy Practices and affirmatively represents to users that it handles PHI subject to HIPAA, cannot credibly claim ignorance of this well-publicized federal guidance. The deployment of the Trackers after this guidance was issued reflects a knowing and deliberate choice to prioritize advertising revenue over Hear.com's legal obligations to its patients and users.

**M. Plaintiffs' Specific Experiences**

99.     Plaintiff Marc Alan Reichbart is a Florida resident who visited the Hear.com Website in or about December 2025. Mr. Reichbart accessed the Website using the Google Chrome browser on his Samsung Galaxy mobile device. Mr. Reichbart did not use ad blockers or "incognito" mode, meaning the Trackers embedded on Hear.com's Website were fully operational during his visits. Before completing the Questionnaire or Hearing Test, Mr. Reichbart was not presented with any cookie banner, pop-up, checkbox, clickwrap, or other affirmative request for permission to disclose his Questionnaire answers, Hearing Test activity, or health-related browsing information to Google, TikTok, Microsoft, or X.

100.    During his visit to the Website, Mr. Reichbart completed the Questionnaire assessing whether he qualified for a free hearing-aid trial. In doing so, Mr. Reichbart provided answers to questions concerning his hearing-loss history and hearing-aid use, his experience of hearing-related conditions, his urgency of need for hearing aids, his credit score, his health insurance information, his employment and retirement status, and his veteran status. Those responses and related Questionnaire events were intercepted in real time and transmitted to TikTok

41

along with Mr. Reichbart's unique _ttp identifier, and to Google, Microsoft, and Twitter/X along with their respective identifying cookies, all without Mr. Reichbart's knowledge or consent. Mr. Reichbart also completed the online hearing screening test on the Website, and this activity was likewise shared with the Third-Party Recipients in real time.

101. Plaintiff Michael B. Gartner is a Florida resident who visited the Hear.com Website within the last two years. Mr. Gartner accessed the Website using the Google Chrome browser on his Samsung Galaxy Android mobile device. Mr. Gartner did not use ad blockers or "incognito" mode, meaning the Trackers embedded on Hear.com's Website were fully operational during his visits. Before completing the Questionnaire, Mr. Gartner was not presented with any cookie banner, pop-up, checkbox, clickwrap, or other affirmative request for permission to disclose his Questionnaire answers or health-related browsing information to Google, TikTok, Microsoft, or X.

102. During his visit to the Website, Mr. Gartner completed the Questionnaire assessing whether he qualified for a free hearing-aid trial, providing responses to questions concerning his hearing-loss history and hearing-aid use, experience of hearing-related conditions, urgency of need, credit score, health insurance information, employment and retirement status, and veteran status. Those responses and related Questionnaire events were intercepted in real time and transmitted to TikTok along with Mr. Gartner's unique _ttp identifier, and to Google, Microsoft, and Twitter/X along with their respective identifying cookies, all without Mr. Gartner's knowledge or consent.

103. Because Hear.com utilized the Trackers on its Website, the Third-Party Recipients intercepted and received Plaintiffs' sensitive medical, financial, and personal information and electronic communications without their knowledge or consent. At no time did Plaintiffs consent

42

to the interception of their sensitive information and electronic communications with Defendant through the Website by Google, TikTok, Microsoft, or Twitter/X, or to Defendant enabling those companies to access or intercept such information. Plaintiffs reasonably expected that their communications with Defendant were solely between themselves and Defendant and that such communications would not be transmitted to or disclosed to third parties.

## INJURY TO PLAINTIFFS AND CLASS MEMBERS

104.    Hear.com's procurement of unauthorized interception of Website user communications has caused actual harm to Plaintiffs and Class Members in multiple ways.

105.    **Invasion of Privacy**: The sensitive health-related, financial, and personal information disclosed through the Questionnaire and the Hearing Test—including users' tinnitus diagnoses, hearing aid dependence, credit scores, insurance carriers, veteran status, and employment circumstances—is among the most private information an individual possesses. Its interception and disclosure to advertising companies can result in significant embarrassment, stigma, and discrimination. Plaintiffs and Class Members have suffered an invasion of their privacy through the unauthorized interception of their electronic communications and health-related disclosures. The interception of these communications violated Plaintiffs' and Class Members' reasonable expectation that their interactions with Hear.com would remain private.

106.    **Loss of Data Value**: Plaintiffs and Class Members have been deprived of the economic value of their personal data. In today's digital economy, personal data—especially health-related, financial, and insurance information—has significant commercial value.

107.    **Diminished Confidence in Healthcare Privacy**: The unauthorized interception of Plaintiffs' and Class Members' communications has undermined their ability to freely and confidentially seek medical information, explore treatment options, or manage their healthcare without fear that their activities and disclosures are being intercepted by third parties.

43

108. **Risk of Further Use of Intercepted Data**: Once intercepted by Google, TikTok, Microsoft, and Twitter/X, Plaintiffs' and Class Members' data is beyond their control. This creates an ongoing risk that their sensitive health-related information may be further processed, combined with other data sources, or potentially used by additional third parties, causing continued and future harm.

109. **Statutory Injury**: Independent of the above harms, Hear.com's violation of the FSCA and ECPA has caused Plaintiffs and Class Members to suffer statutory injury, entitling them to the remedies provided by law, including statutory damages.

## CLASS ACTION ALLEGATIONS

110. Plaintiffs bring this action on behalf of themselves individually and on behalf of all other persons similarly situated pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

111. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

All individuals residing in the United States who visited Hear.com's Website and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by Hear.com, including Google, TikTok, Microsoft, and/or Twitter/X, within the applicable statute of limitations period (the "Nationwide Class").

112. The Florida Class the Plaintiffs seek to represent is defined as follows:

All individuals residing in Florida who visited Hear.com's Website and whose electronic communications were intercepted by one or more third-party tracking technologies deployed by Hear.com, including Google, TikTok, Microsoft, and/or Twitter/X, within the applicable statute of limitations period (the "Florida Class").

113. Together, the Nationwide Class and the Florida Class are referred to as the "Class."

114. Excluded from the Class are: (a) Defendant, its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (b) Google, TikTok, Microsoft, and Twitter/X, their officers, directors, affiliates, legal representatives, employees, successors,

44

subsidiaries, and assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned, their immediate family members, and staff, as well as the attorneys for Plaintiffs and Defendants and their staff; and (e) any jurors assigned to this case.

115.    Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

116.    **<u>Numerosity.</u>** The Class is so numerous that joinder of all members is impracticable. Hear.com is one of the largest direct-to-consumer hearing care platforms in the United States, with approximately 2.5 million affected Website visitors. Upon information and belief, the Website receives millions of unique visitors each year, many of whom had their electronic communications intercepted by the Third-Party Recipients during the relevant period.

117.    The Class is ascertainable because its members can be identified through objective criteria using records maintained by Defendant and third parties. Hear.com's web server logs, Google Analytics account data, TikTok account data, Microsoft account data, and Twitter/X account data contain records of Website visitors whose electronic communications were intercepted by the Trackers during the applicable statute of limitations period. These records include IP addresses, cookie identifiers, timestamps, and the specific pages and Questionnaire answers involved. The identities of Class Members can be determined without resort to individualized fact-finding or mini-trials. In addition, Hear.com collects names and email addresses from users who complete the Questionnaire and Hearing Test, and Hear.com's own customer relationship management records, together with the advertising account records of the Third-Party Recipients obtainable through discovery, provide objective, reliable means of identifying Class Members.

118.   **Commonality and Predominance.** There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a) Whether Hear.com implemented the Trackers on its Website;

(b) Whether the Trackers intercepted Website users' electronic communications;

(c) Whether Hear.com procured, enabled, and aided and abetted the interception of Website users' electronic communications;

(d) Whether Hear.com obtained Website users' consent to procure the interception of their electronic communications;

(e) Whether Hear.com's conduct violated Chapter 934.03 of the FSCA;

(f) Whether Hear.com's conduct violated Section 2511 of the ECPA;

(g) Whether Hear.com has been unjustly enriched through its conduct;

(h) Whether Plaintiffs and Class Members are entitled to damages and other monetary relief, and if so, in what amount; and

(i) Whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to injunctive relief.

119.   These common questions predominate over any individualized issues because Plaintiffs' claims challenge Hear.com's uniform, centralized conduct—the deployment of identical tracking code across its entire Website, including across the Questionnaire and Hearing Test pages—rather than any individualized interaction between Hear.com and a particular Class Member. The Trackers operated in the same manner on every page of the Website, intercepting the same categories of data and transmitting that data to the same third parties using the same cookies and identifiers, regardless of which user visited the site. Liability can therefore be

established on a class-wide basis through common proof, including Hear.com's Website source code, its contracts or arrangements with Google, TikTok, Microsoft, and Twitter/X, and the technical operation of the Trackers.

120. Any individualized questions—such as the specific pages a given Class Member visited or the precise dates of their visits—do not predominate because they are relevant only to damages, not to the threshold questions of liability and consent that are common to the entire Class. Courts routinely hold that predominance is satisfied in healthcare website tracking cases because the core liability inquiry focuses on the defendant's uniform deployment of tracking technology without consent, not on the content of any individual user's browsing session.

121. **Typicality.** Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and Class Members all visited Hear.com's Website and had their electronic communications intercepted by the Third-Party Recipients without their consent. Plaintiffs, like other Class Members, completed the Questionnaire and the online Hearing Test on the Website, disclosing sensitive health, financial, and personal information that was intercepted and transmitted to third-party advertisers without their knowledge. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class Members and are based on the same legal theories.

122. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

123. Plaintiffs have retained counsel who are experienced in complex class action litigation, including class actions involving privacy violations, unlawful data collection, and the

interception of electronic communications in the healthcare context. Plaintiffs' counsel have the resources, expertise, and commitment to prosecute this action vigorously on behalf of the entire Class through discovery, class certification, trial, and any appeals.

124.     **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class Members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class Members to individually redress the wrongs done to them. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications. A class action provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

125.     **Injunctive Relief Appropriate:** Hear.com has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

126.     **Individual Issues.** Alternatively, Plaintiff seeks certification of the common issues identified above under Rule 23(c)(4). Certification of those issues would materially advance the litigation, promote uniform adjudication of Defendant's common conduct, and narrow any individualized questions that may remain after the classwide issues are resolved.

## CAUSES OF ACTION
### COUNT I: VIOLATION OF THE FLORIDA SECURITY OF COMMUNICATIONS ACT (Fla. Stat. § 934.03)
### (On Behalf of Plaintiffs and the Florida Class)

127.     Plaintiffs incorporate paragraphs 1–126, above, as if fully set forth herein and bring this Count individually and on behalf of the proposed Florida Class.

128.     The FSCA prohibits intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any electronic communication.

48

Fla. Stat. § 934.03(1)(a). Unlike the federal Wiretap Act, the FSCA is an all-party consent statute, requiring the consent of all parties to the communication. Fla. Stat. § 934.03(2)(d).

129.    The FSCA defines "intercept" as "the aural or other acquisition of the contents of any electronic communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3). It further defines "contents" as "any information concerning the substance, purport, or meaning of that communication." Fla. Stat. § 934.02(7). The FSCA was specifically "designed to protect precisely the information at issue in this case—private medical information." *W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *4 (M.D. Fla. Mar. 6, 2025).

130.    The Trackers deployed on Hear.com's Website constitute "electronic, mechanical, or other device[s]" within the meaning of the FSCA. Unlike session replay technology that merely tracks mouse movements, the Trackers at issue here actively intercept and transmit the *contents* of users' communications, including the specific answers users provide to Questionnaire questions about their medical conditions, insurance status, financial circumstances, and personal background.

131.    The transmissions between Plaintiffs and Class Members and Hear.com's Website constitute "electronic communications" within the meaning of the FSCA because they are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system. Fla. Stat. § 934.02(12).

132.    The Trackers intercept the "contents" of Plaintiffs' and Class Members' electronic communications, not merely routing or addressing information. The specific answers users provide in the Questionnaire—transmitted in the body of POST requests to the Third-Party Recipients' servers—plainly constitute "information concerning the substance, purport, or meaning" of the

49

user's communication within the meaning of Fla. Stat. § 934.02(7). Similarly, the URLs of medical-condition pages visited by users encode the specific medical condition being researched and therefore constitute "contents" rather than routing information. *See W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *4–5 (holding that URLs reflecting medical services sought constitute "contents" under the FSCA).

133.    Hear.com intentionally procured Google, TikTok, Microsoft, and Twitter/X to intercept these electronic communications by deliberately implementing the Trackers on its Website. Plaintiffs and Class Members did not consent to this interception.

134.    As a direct result of Hear.com's violations, Plaintiffs and Class Members are entitled to: (a) actual damages or statutory damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and costs of litigation under Fla. Stat. § 934.10.

135.    Plaintiffs and Class Members are also entitled to injunctive relief to prevent Hear.com from continuing to implement Trackers that intercept their electronic communications without proper consent.

## COUNT II: VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT (18 U.S.C. § 2511 et seq.)
### (On Behalf of Plaintiffs and the Nationwide Class)

136.    Plaintiffs incorporate paragraphs 1–126, above, as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

137.    The ECPA prohibits the intentional interception of electronic communications, and the procuring of any other person to intercept electronic communications. 18 U.S.C. § 2511(1)(a).

138.    The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2520(a).

139.    The transmissions between Plaintiffs and Class Members and Hear.com's Website are "transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and therefore constitute "electronic communications" within the meaning of the ECPA. 18 U.S.C. § 2510(12).

140.    The Trackers intercepted the "contents" of Plaintiffs' and Class Members' electronic communications within the meaning of the ECPA, for the same reasons set forth above with respect to the FSCA.

141.    Although the ECPA contains a one-party consent exception, 18 U.S.C. § 2511(2)(d), that exception does not apply here because the communications were intercepted for the purpose of committing criminal and tortious acts in violation of the Constitution or laws of the United States and the State of Florida. Specifically, the crime-tort exception to the one-party consent rule applies because Hear.com procured the interceptions for the purpose of using and disclosing users' individually identifiable health information to third parties for commercial advantage without authorization, in violation of HIPAA, 42 U.S.C. § 1320d-6. A disclosure that violates HIPAA is a violation of law independent of the ECPA. At minimum, whether Hear.com acted with that unlawful purpose is a fact-intensive issue that should be decided by the factfinder based on a complete evidentiary record. *See Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025); *W.W.*, 2025 WL 722892, at *6–7 (M.D. Fla. Mar. 6, 2025); *Kurowski v. Rush System for Health*, 2023 WL 2349606 (N.D. Ill. Mar. 3, 2023). Hear.com's

knowing violation of HIPAA is established by, among other things, its own publication of a HIPAA Notice of Privacy Practices and its awareness of HHS's December 2022 guidance specifically warning covered entities that pixel tracking on healthcare websites violates HIPAA.

142.    That Hear.com may have been motivated by commercial purposes does not preclude application of the crime-tort exception. *See Stein*, 2025 WL 580556, at *6 ("The language of the statute gives no hint that conduct falls outside the reach of the statute if a person acted based on financial motivations.").

143.    Hear.com intentionally procured Google, TikTok, Microsoft, and Twitter/X to intercept these electronic communications by deliberately implementing the Trackers on its Website, within the meaning of 18 U.S.C. § 2511(1)(a). Users did not consent to Hear.com's procurement of third-party interception or to the sharing of their Questionnaire answers, Hearing Test activity, health-related interactions, and associated identifiers for advertising, analytics, retargeting, or conversion-optimization purposes.

144.    Hear.com was not acting under the color of law when procuring these interceptions, and no other exception to ECPA liability applies.

145.    As a direct result of Hear.com's violations, Plaintiffs and Class Members are entitled to: (a) actual damages or statutory damages of $100 per day per violation or $10,000, whichever is greater; (b) punitive damages; and (c) reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

**COUNT III: UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

146.    Plaintiffs incorporate paragraphs 1–126, above, as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

147.    Hear.com has received a benefit from Plaintiffs and Class Members by inducing them to provide valuable personal data through the Questionnaire and Hearing Test and then using the Trackers to exploit that data for business purposes.

148.    By implementing the Trackers on its Website, Hear.com obtained analytics, conversion measurement, retargeting, audience-building, advertising attribution, and sales-funnel optimization benefits. Those benefits enabled Hear.com to qualify leads, retarget users, improve advertising efficiency, and increase sales of hearing aids and related hearing-care services, thereby enriching itself at the expense of Plaintiffs and Class Members.

149.    Private information, at least in the context of sensitive medical and financial information, has value. *See W.W.*, 2025 WL 722892, at *10.

150.    Hear.com knowingly accepted and retained these benefits under circumstances that make it inequitable to do so without paying the value of the data and commercial benefits obtained from Plaintiffs and Class Members.

151.    It would be unjust and inequitable to allow Hear.com to retain the benefits of its unlawful conduct.

152.    Plaintiffs and Class Members are entitled to restitution and disgorgement of all profits, benefits, and other compensation obtained by Hear.com through its wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of all other Class Members similarly situated, respectfully request that this Court:

(a) Certify this case as a class action on behalf of the proposed Class, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

(b) Declare that Hear.com's actions, as described herein, violate the FSCA and the ECPA, and constitute unjust enrichment;

(c) Award Plaintiffs and the Class compensatory damages in an amount to be determined at trial;

(d) Award Plaintiffs and the Class statutory damages as provided by the FSCA and ECPA;

(e) Award Plaintiffs and the Class punitive damages;

(f) Award Plaintiffs and the Class restitution and disgorgement of all profits, benefits, and other compensation obtained by Hear.com from its wrongful conduct;

(g) Award injunctive relief requiring Hear.com to cease procuring the interception of Website users' communications without proper consent; disable or segregate Trackers from sensitive Questionnaire, Hearing Test, and health-related pages unless valid consent and authorization are obtained; request deletion of improperly transmitted data from the Third-Party Recipients to the extent within Hear.com's control or contractual rights; and implement appropriate safeguards to protect Website users' privacy in the future;

(h) Award Plaintiffs and the Class pre-judgment and post-judgment interest;

(i) Award Plaintiffs and the Class reasonable attorneys' fees and costs, as allowed by law; and

(j) Grant such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all claims and issues so triable.

[*Signature Block on Following Page*]

54

Dated: May 15, 2026

Respectfully submitted,

By: */s/ Adam A. Schwartzbaum*

Adam A. Schwartzbaum, Esq.
Florida Bar No. 93014
**SCHWARTZBAUM**
14 NE 1st Ave Ste 705
Miami, FL 33132
Telephone: 786-453-8485
Primary Email: adam@schwartzbaum.com
Secondary Email: admin@schwartzbaum.com

*Counsel for Plaintiffs and the Proposed Class*

55